IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

HOMELAND INSURANCE COMPANY                    Case No. 3:15-cv-01745-JR
OF NEW YORK,

              Plaintiff,                             OPINION AND ORDER

              v.

CENTIMARK CORPORATION,

              Defendant.

RUSSO, Magistrate Judge:

Plaintiff Homeland Insurance Company of New York and defendant Centimark Corporation cross-move for summary judgment pursuant to Fed. R. Civ. P. 56. All parties have consented to allow a Magistrate Judge enter final orders and judgment in this case in accordance with Fed. R. Civ. P. 73 and 28 U.S.C. § 636(c). For the reasons set forth below, the parties' motions are granted in part and denied in part.

## BACKGROUND[1]

The history of this matter is well known to the parties and therefore will only be recounted to the extent relevant to the present dispute. In mid-2013, defendant contracted with Del Monte Foods, Inc. to perform roof repair work on a Del Monte warehouse in Yakima, Washington. A portion of the project required asbestos abatement and removal. Because defendant is not a certified asbestos abatement contractor, it hired AAM, Inc., a roofing subcontractor with the appropriate license, and entered into a subcontract. This subcontract required that AAM add defendant and Del Monte as "additional insureds" to its insurance policy with plaintiff (the "Policy"), which included a commercial general liability clause. Endorsements were added to the Policy extending coverage to additional insureds, "but only with respect to liability arising out of [AAM's] ongoing operations [or] work performed for that insured." Policy 54-55 (doc. 101-2).

While working on the Del Monte project as an AAM employee, Juan Orta-Carrizales fell through the warehouse roof and landed on the ground approximately forty feet below, suffering severe injuries as a result. Specifically, while carrying a bag of removed asbestos towards the drop-point, Orta-Carrizales stepped off the roof joist and onto the unstable gypsum decking. Although he was wearing a rope grab safety harness,[2] he had not adjusted the slack following his last trip to pick up asbestos away from the tether. At the time of his injury, Orta-Carrizales had been working

---

[1] The Court cites to plaintiff's evidence except when referring to the non-duplicative information produced by defendant, and to the docket numbers of the parties' exhibits except where individually labeled and numbered. To the extent plaintiff and defendant attack each other's recitation of facts or law, this Court is not bound by either party's characterization and instead independently reviews the record and any relevant legal authority to determine whether summary judgment is appropriate. Only the facts sustained by the record are recounted herein.

[2] There are two harness systems at issue in this case: rope grab and retractable. A rope grab system "is manually adjusted, and a retractable constantly pulls at your back" – i.e., it adjusts automatically like a seat belt. Brownstein Decl. Ex. 8, at 4 (doc. 140-1).

in the construction field, performing projects including but not limited to roofing and asbestos remediation, for approximately six years. While this was his first project with AAM, he had received training in fall safety and rope grab harnesses and understood that he needed to manually adjust his harness so that no more than six feet of slack existed.

In April 2015, Orta-Carrizales brought a personal injury negligence action against defendant and Del Monte in Yakima County Superior Court (the "Underlying Lawsuit"). Due to the exclusivity of the state workers' compensation system, Orta-Carrizales filed a workers' compensation claim with AAM's workers' compensation insurer instead of naming AAM in the Underlying Lawsuit.

In September 2015, plaintiff initiated this insurance coverage action against defendant. The parties subsequently filed cross-motions for summary judgment.

In May 2016, the Court granted defendant's motion in regard to plaintiff's duty to defend "against damages caused by AAM's negligence" in the Underlying Lawsuit. Homeland Ins. Co. of N.Y. v. AAM, Inc. ("Homeland I"), 2016 WL 2841944, *6, 9 (D. Or. May 13), recons. denied by 2016 WL 11673276 (D. Or. Aug. 31, 2016) (citation omitted). The Court deferred ruling with respect to plaintiff's duty to indemnify given that, "[a]t this point in the proceedings, even assuming the evidence establishes that AAM bears some fault for Orta-Carrizales's injury, it remains uncertain whether CentiMark or Del Monte also bear some fault." Id. at *9. In so holding, the Court made clear that, under the Policy, defendant was entitled to "indemnification for only liability that did not result from their own negligence." Id.

In September 2016, the Court stayed this action pending resolution of the Underlying Lawsuit. Defendant settled the Underlying Lawsuit with Orta-Carrizales in January 2019 for $675,000, after which the stay was lifted. Plaintiff thereafter filed its First Amended Complaint

alleging claims for: (1) declaratory judgment, (2) equitable subrogation, (3) contribution, and (4) unjust enrichment. Plaintiff seeks reimbursement from defendant for the settlement portion representing defendant's independent negligence related to Orta-Carrizales' injuries.

In July 2019, the Court granted plaintiff's motion to strike defendant's Third-Party Complaint against AAM, emphasizing that, "[t]o the extent CentiMark can prove that it was not negligent itself and that its liability [from the Underlying Lawsuit] arose only out of the negligence of AAM, Homeland will not recover." Homeland Ins. Co. of N.Y. v. CentiMark Corp. ("Homeland II"), 2019 WL 8223065, *3 (D. Or. July 22, 2019); see also Homeland I, 2016 WL 2841944 at *7 (explaining that "an injured employee's failure to name his employer in an underlying personal injury action is attributable to the exclusivity of [the state] workers' compensation law," such that the court's "inquiry focuses on whether [the employer's] fault is implied") (citation and internal quotations omitted).

On February 8, 2021, the parties filed the present motions for summary judgment. Briefing in regard to those motions was completed on April 5, 2021.

## STANDARD

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file, if any, show "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). Substantive law on an issue determines the materiality of a fact. T.W. Elec. Servs., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party determines the authenticity of the dispute. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts that show a genuine issue for trial. Id. at 324.

Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. T.W. Elec., 809 F.2d at 630.

## DISCUSSION

The resolution of the parties' motions hinges on whether there is evidence of defendant's own negligence in relation to Orta-Carrizales' injury and the Underling Lawsuit.

## I.     Defendant's Evidentiary Objections

Defendant argues the opinion of plaintiff's expert, Rick Gleason, should be stricken in part because it lacks an adequate factual foundation. Notably, defendant asserts Gleason's testimony that, if Orta-Carrizales "had been using a retractable fall arrest system [or] Centimark had put down additional plywood and/or marked the joists" he "would not have fallen[,] are pure speculation." Def.'s Resp. to Mot. Summ. J. 6 (doc. 148). In addition, defendant maintains that Gleason's conclusion regarding the need for AAM's fall protection plan to have explicitly "stated employees could not have more than six feet of slack in their lanyards" is not supported by the record. Id. at 16.

Defendant also contends that the statements of Vincente Trindad, Javier Sanavria, and Guadalupe Leyva qualify as inadmissible hearsay, as does Orta-Carrizales' testimony about a "conversation among AAM workers on how to carry the debris and adjust rope grabs." Id. at 5.

## A.    Expert Testimony

Pursuant to Rule 702:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Under Rule 702, the trial court serves a "gatekeeper" function by determining whether the expert testimony has "a reliable basis in the knowledge and the experience of [the relevant] discipline." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 592 (1993). Even if an expert is generally qualified under Kumho Tire Co. v. Carmichael, 526 U.S. 137, 154 (1999), the court must determine the reasonableness of applying the expert opinion to draw conclusions about the specific matter to which it is directed and may ultimately "conclude that there is simply too great an analytical gap between the data and the opinion proffered." Gen. Elec. v. Joiner, 522 U.S. 136, 146 (1997).

As an initial matter, defendant does not challenge Gleason's qualifications. Moreover, the fact that defendant and its expert (i.e., Brian Clarke) reach conclusions different from Gleason's based on predominantly the same evidence does not render Gleason's methodology or reasoning invalid. Whether defendant's expert is ultimately more persuasive is not for the Court to decide. See Boydstun v. U.S. Bank Nat'l Assoc., 187 F.Supp.3d 1213, 1216 (D. Or. 2016) ("[c]hallenges to the weight of the evidence and the expert's credibility are for a jury, not a trial judge, to evaluate").

For the most part, Gleason explains what information his opinion is based on and how he reached his conclusions. Defendant is nonetheless correct that limited portions of Gleason's opinion pose too large an analytical leap and veer into the range of impermissible legal conclusion. See Gen. Elec., 522 U.S. at 146 (court properly excludes expert testimony that presents "too great an analytical gap between the data and the opinion proffered"); see also Guidroz-Brault v. Mo. Pac. R.R. Co., 254 F3d 825, 831-32 (9th Cir. 2001) ("[t]he factual basis for the expert's opinion must be stated in the expert's affidavit"); Bogner v. R & B Sys., Inc., 2011 WL 1832750, *3 (E.D. Wash. May 12, 2011) (court "is not bound by [a declarant's] legal conclusions"; disputed issues of material fact can "not [be] created by simply averring that an act 'was [a legal violation or]' declaring that one's versions of events is 'consistent' with one's theory of the case . . . declarations [must only be considered] for the facts contained therein").

In particular, the following statements in Gleason's declaration and/or report lack an adequate foundation: defendant should have "put down plywood to increase safety" and required that AAM's "Fall Protection Work Plan . . . specify the safe use of the sliding rope grab device." Gleason Decl. ¶ 5 (doc. 141); Gleason Decl. Ex. 1, at 5-6, 11-12 (doc. 141-1).

As addressed herein, Washington law forbade defendant from being in the area AAM was working or directly supervising AAM's asbestos remediation. Brownstein Decl. Ex. 6, at 5 (doc. 140-1). This effectively prevented defendant from installing a plywood walkway within AAM's periphery.[3] Ho Decl. Ex. F, at 3 (doc. 138-6). There is likewise no evidence that marking joints or installing a plywood walkway would have prevented Orta-Carrizales's injuries, given the nature

---

[3] Presumably for this reason the Washington Department of Labor and Industries concluded that it was AAM's responsibility, as opposed to defendant's, to install "additional plywood to support roofing material where workers stand" and to "remove [the plywood] prior to roof removal and move [it] to adjacent area." Brownstein Decl. Ex. 14, at 12-13 (doc. 140-2).

of AAM's work and how the accident occurred. See, e.g., Ho Decl. Ex. A, at 11 (doc. 149-1); Clarke Decl. ¶ 7 (doc. 150); Clarke Decl. Ex. D, at 1 (doc. 150-4). Plaintiff has not cited to, and the Court is not aware of, a standard of care or statutory duty requiring: (1) a general contractor to mark joists or create a plywood walkway; or (2) a subcontractor to specify the amount of slack allowed in employee lanyards in its fall protection plan.

Defendant's motion is granted as to the aforementioned portions of Gleason's testimony. The remaining aspects of Gleason's opinion are sufficiently fact-based to be of assistance to the trier of fact; any purported deficiencies can be challenged through cross-examination and presentation of contrary evidence. See Daubert, 509 U.S. at 595-96 (even where an expert is expected to deliver "shaky" testimony, admission of the testimony may be proper as "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking" such evidence); see also Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc., 738 F.3d 960, 969-70 (9th Cir. 2013) ("the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable").

## B. Remaining Objections

Defendant's remaining objections are not well-taken. Trindad, Sanavria, and Leyva's statements appear exclusively in the Washington Department of Labor and Industries' "Inspection Summary Report." Brownstein Decl. Ex. 14, at 8-10 (doc. 140-2). As a result, their statements fall into an exception to the hearsay rule. Namely, records of a regularly conducted activity are admissible under Rule 803 if:

> (A) the record was made at or near the time by--or from information transmitted by--someone with knowledge; (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; (C) making the record was a regular practice of that activity; (D) all

these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6).[4]

Here, the report from the regulatory body investigating Orta-Carrizales' on-the-job injury undeniably meets this standard, especially considering that defendant has neglected to point to any lack of trustworthiness regarding that report or the Washington Department of Labor and Industries' inspection methods. See United States v. Childs, 5 F.3d 1328, 1333-34 (9th Cir. 1993) (records that an organization receives from another organization are admissible under Fed. R. Evid. 803(6) when they are kept in the regular course of the business, are relied upon by that organization, and a substantial interest exists in the accuracy of the records); see also Perrin v. Anderson, 784 F.2d 1040, 1046-47 (10th Cir. 1986) (factual findings and opinions found in evaluative reports resulting from an investigation made pursuant to authority granted by law are admissible, especially in the absence of any evidence of untrustworthiness).

Orta-Carrizales' testimony about a conversation amongst AAM employees appears to have been introduced to show defendant's employees were using retractable harnesses (a fact which is not in dispute) and not, as defendant contends, "to prove that the AAM workers purportedly

---

[4] Plaintiff also argues that these statements qualify under Rule 803(1) "as a present sense impression, given that they were made by witnesses to a horrific accident." Pl.'s Reply to Mot. Summ. J. 4 (doc. 153). Yet the Washington Department of Labor and Industries' "Inspection Summary Report" does not reflect that Trindad, Sanavria, or Leyva directly witnessed Orta-Carrizales' fall, except to the extent Trinidad "saw his head go down." Brownstein Decl. Ex. 14, at 8-10 (doc. 140-2); see also Bemis v. Edwards, 45 F.3d 1369, 1373 (9th Cir. 1995) ("the proponent of hearsay evidence [must] show that the declarant could have witnessed the [incident]") (citations and internal quotations omitted). In any event, the comments that plaintiff relies on pertaining to AAM's lack of safety training do not concern the circumstances of Orta-Carrizales' accident.

believed it was difficult to adjust their rope grabs as they carried the debris." Brownstein Decl. Ex. 12, at 5 (doc. 140-2); Def.'s Resp. to Mot. Summ. J. 5-6 (doc. 148). In other words, this statement is not offered for the truth of the matter asserted, such that it is admissible for the limited purpose of establishing that defendant's employees were using retractable harnesses. See Maxwell v. Kelly Servs., Inc., 730 F.Supp.2d 1254, 1265 (D. Or. 2010) (a statement offered for a purpose other than to prove the truth of the matter asserted is not hearsay). Defendant's evidentiary objections are granted in part and denied in part.

## II.    Defendant's Amended Motion for Summary Judgment

Defendant argues that it is entitled to summary judgment for three reasons. First, according to defendant, plaintiff's claims are "[i]n substance . . . subrogation claims" but neither Oregon law nor the Policy permit a subrogation suit in this context. Def.'s Am. Mot. Summ. J. 9-10 (doc. 142). Second, defendant contends that plaintiff's damages claims are barred by the Policy's "Waiver of Our Right to Recover from Others" endorsement. Id. at 10-11. Finally, defendant maintains that it "was prohibited by Washington law from being in the asbestos remediation area" such that it "could not have supervised AAM's work." Id. at 11.

As an initial matter, plaintiff's claims all proceed under legally distinct equitable theories, such that they cannot fairly be categorized as seeking contractual subrogation in substance. See EMCASCO Ins. Co. v. Cartwright, 2020 WL 5793419, *2 (D. Or. Sept. 28, 2020) (outlining the requirements of a declaratory judgment claim); Maine Bonding & Cas. Co. v. Centennial Ins. Co., 298 Or. 514, 520–22, 693 P.2d 1296 (1985) (outlining the requirements of an equitable subrogation claim, which arise "by operation of law, as opposed to conventional subrogation arising under an express or implied agreement"); Farmers Ins. Co. of Or. v. St. Paul Fire & Marine Ins. Co., 305 Or. 488, 492, 752 P.2d 1212 (1988) (outlining the requirements of a contribution claim, explicitly

denoting that "such rights do not arise by way of subrogation") (citation and internal quotations and brackets omitted); Great Am. Ins. Co. v. Linderman, 116 F.Supp.3d 1183, 1195 (D. Or. 2015) (outlining the requirements of an unjust enrichment claim, noting that it flows from the premise that "it would be unjust to allow the recipient to retain the benefit without requiring her to pay for it" and can proceed under a theory of overpayment).

Concerning defendant's first argument, this Court previously determined that the Policy permitted indemnification exclusively for AAM's liability, such that plaintiff could recover via this action for defendant's negligence. Homeland I, 2016 WL 2841944 at *9; Homeland II, 2019 WL 8223065 at *3; see also Pl.'s Resp. to Am. Mot. Summ. J. 5 (doc. 151) ("Homeland is not seeking repayment of settlement amounts that it paid to settle the portion of CentiMark's liability that arose out of AAM's work"). Stated differently, defendant's own negligence is uninsured, and plaintiff is only seeking damages is association therewith, such that there is no issue with Oregon's or the Policy's preclusion against an insurer seeking subrogation against its own insured. As a result, the precedent defendant relies on is inapt. Cf. Am. Int'l Specialty Lines Ins. Co. v. Kindercare Learning Ctr., Inc., 2011 WL 1002172, *3 (D. Or. Mar. 18, 2011) ("under Oregon law the insurers may not assert claims for indemnity, only subrogated contribution claims" in relation to repayment of settlement amounts from other parties).

Regarding defendant's second argument, the "Waiver of Our Right to Recover from Others" endorsement is not part of the general liability Policy at issue in this case. Instead, it appears under a "Workers Compensation and Employers Liability Insurance Policy" that bears a different policy number. See generally Policy (doc. 101-2); compare Ho Declaration Ex. D, at 1-6 (doc. 138-4), with id. at 7. Indeed, defendant implicitly concedes in its reply brief that the "Waiver of Our Right to Recover from Others" endorsement concerns a separate policy. See Def.'s Reply

to Am. Mot. Summ. J. 6 (doc. 152) (abandoning its argument related to the "Waiver of Our Right to Recover from Others" endorsement and instead addressing the "Waiver of Transfer of Rights of Recovery Against Others to Us" endorsement).

The relevant Policy endorsement – i.e., the "Waiver of Transfer of Rights of Recovery Against Others to Us" endorsement – states that plaintiff "waive[s] any right of recovery [it] may have against [defendant] because of payments [made] for injury or damage arising out of [AAM's] ongoing operations or [AAM's] work done under a contract with [defendant] and included in the products-completed operations hazard." Policy 6, 19, 48, 52-54, 58 (doc. 101-2). Thus, this provision unambiguously does not impact plaintiff's right to recover amounts it paid for an injury that did not arise out of AAM's negligence.

Finally, there is no dispute that defendant was not contemporaneously allowed in the area in which AAM was working because it is not an asbestos certified contractor. In particular, Washington law provides "[a] certified asbestos supervisor must provide direct, on-site supervision for asbestos abatement projects" and "[a]sbestos workers must have access to, and be under the control of, certified asbestos supervisors throughout the duration of asbestos abatement projects." WAC 296-65-030. The law emphasizes that "[o]nly certified asbestos workers may work on an asbestos project [and] [o]nly certified asbestos supervisors may supervise asbestos abatement projects." WAC 296-62-07722(1); Rev. C. Wash. § 49.26.115.

However, the fact that defendant was not allowed to supervise AAM's asbestos remediation work or have its employees in the asbestos remediation area while that work was occurring does not wholly resolve the issues in this case.[5] As defendant acknowledges, "there are

---

[5] Defendant's argument that it cannot be liable because it "was not cited" by the Department of Labor and Industries is equally unpersuasive. Def.'s Am. Mot. Summ. J. 14 (doc. 142); Def.'s Resp. to Mot. Summ. J. 12-13 (doc. 148). The record before the Court contains evidence that was

no cases directly on point."[6] Def.'s Am. Mot. Summ. J. 13 (doc. 142). Yet, as discussed in greater detail below, precedent does exist concerning a general contractor's common law and statutory duties of care related to job site safety, and this precedent makes clear that those duties persist irrespective of whether a subcontractor is directly responsible for supervising a job or area. See Vargas, 194 Wash.2d at 733 (rejecting the defendant's argument that the general contractor's direct liability could not extend to "areas in which an expert in a specific job is in charge, no other subcontractors are engaged in different work, and the general contractor is not present"); see also Thoen v. CDK Const. Servs., Inc., 13 Wash.App.2d 174, 176, 466 P.3d 261 (2020) ("[n]either duty is predicated on the general contractor actually exercising control over the subcontractor or the subcontractor's employees [nor is either] limited to common work areas"). The application of this rule is especially appropriate considering Orta-Carrizales' injuries were not asbestos-related but rather roofing-related.

Accordingly, the Court declines to find that defendant cannot be held liable as a matter of law in light of WAC 296-65-030, WAC 296-62-07722(1), and Rev. C. Wash. § 49.26.115. Whether there is otherwise any evidence before the Court from which a reasonable jury could infer that defendant's purported negligence caused Orta-Carrizales' injuries is addressed in Section III.

---

not considered during the initial investigation into Orta-Carrizales' accident. See Vargas v. Inland Wash. LLC, 194 Wash.2d 720, 737-38, 452 P.3d 1205 (2019) ("that the Department of Labor and Industries inspected the incident and found that [the defendant] committed no WISHA violations" is not dispositive where the court is privy to facts "the department was unable to uncover during its [short] investigation period"); see also Gleason Decl. ¶ 6 & Ex. 2 (doc. 141) ("[t]he fact that Centimark was not cited . . . does not mean that Centimark could not be liable . . . the General Contractor is not always cited by L&I DOSH [for any number of reasons] and it is a matter of discretion for the investigator").

[6] The only case that defendant relies on – State v. P.B.M.C., Inc., 114 Wash. 2d 454, 788 P.2d 545 (1990) – merely stands for the proposition that "a general contractor has innate supervisory authority and therefore, per se control over the workplace." Def.'s Am. Mot. Summ. J. 13 (doc. 142).

## III. Plaintiff's Motion for Summary Judgment

Plaintiff contends summary judgment is warranted because, "[o]ther than informing AAM that the job would be '100% tie-off,' there is no evidence that CentiMark did anything else to ensure that AAM was working safely."[7] Pl.'s Mot. Summ. J. 13 (doc. 139).

It is undisputed that the nature of defendant's liability is governed by Washington law, under which the following elements must be met to prove negligence: (1) "the existence of a duty," (2) "breach of the duty," and (3) "injury to plaintiff proximately caused by the breach." Vargas, 194 Wash.2d at 730 (citations and internal quotations omitted); see also Pl.'s Mot. Summ. J. 16 (doc. 139); Def.'s Resp. to Mot. Summ. J. 6 n.2 (doc. 148) (relying on Washington negligence law).

"Existence of a duty is a question of law," whereas "[b]reach and proximate cause are generally issues for the trier of fact." Vargas, 194 Wash.2d at 730 (citations and internal quotations omitted). Therefore, the court may resolve the second and third elements only if there is no doubt that the defendant's conduct was reasonable. Id.; see also Fabrique v. Choice Hotels Int'l., Inc., 144 Wash.App. 675, 683, 183 P.3d 1118 (2008) (proximate cause may be determined on summary judgment where the evidence is undisputed and one reasonable conclusion is possible).

### A. Duty of Care

_____

[7] Plaintiff also maintains the Underlying Lawsuit exclusively concerned defendant's negligence. Pl.'s Mot. Summ. J. 5 (doc. 139). However, the Court previously rejected this argument. Homeland I, 2016 WL 2841944 at *7 (collecting cases). In other words, the fact that AAM was not named in the Underlying Lawsuit and defendant was the sole party to pay damages does not establish, as a matter of law, the exclusivity of defendant's fault. See id. at *9 (acknowledging that "AAM's negligence would be the most likely source of [defendant's] liability" under the Policy).

Under Washington law "[g]eneral contractors have expansive statutory and common law duties to provide a safe workplace." Vargas, 194 Wash.2d at 722-23 (citing Stute, 114 Wash.2d 454; and Kelley v. Howard S. Wright Constr. Co., 90 Wash.2d 323, 582 P.2d 500 (1978)). "Our precedent therefore places prime responsibility for safety of all workers on the general contractor, because the general contractor is in the best position to coordinate work or provide expensive safety features to protect employees of subcontractors." Id. at 736 (citations and internal quotations and ellipses omitted). A general contractor may be held directly liable for their own negligence under either common law or the Washington Industrial Safety and Health Act ("WISHA"). Id. at 730.

### i. Common Law Duty

"[W]hen a general contractor engages a subcontractor and retains control over some part of the work, the general contractor has a duty, within the scope of that control, to provide a safe place of work." Id. (citations and internal quotations omitted). "The test of control is not the actual interference with the work of the subcontractor, but the right to exercise such control." Id. (citations and internal quotations omitted). As such, a general contractor's "general supervisory functions are sufficient to establish control" over the work conditions of the subcontractor's employee, "regardless of whether an expert other than the general contractor happens to be in charge of a specific job in the area" and "regardless of whether the general contractor is present." Id. (citations and internal quotations omitted).

Here, the record reflects that defendant supervised the job site and had a right to exercise control over AAM's work area and compliance with safety guidelines. Defendant's subcontract with AAM required AAM to "take such additional precautions as [defendant] may reasonably require for safety and accident prevention purposes." Brownstein Decl. Ex. 5, at 1 (doc. 140-1). It

is undisputed that, in its role as the general contractor, defendant was responsible for the site's safety. Brownstein Decl. Ex. 8, at 2 (doc. 140-1); Brownstein Decl. Ex. 9, at 2-3 (doc. 140-1); Brownstein Decl. Ex. 10, at 2 (doc. 140-1). And the record demonstrates that defendant did, in fact, direct that the job was "hundred percent tie off" – i.e., employees were required to wear tethered safety harnesses at all times. Brownstein Decl. Ex. 4, at 2, 4 (doc. 140-1); Brownstein Decl. Ex. 6, at 2 (doc. 140-1); Brownstein Decl. Ex. 8, at 4 (doc. 140-1).

Additionally, there is evidence that defendant breached its common law duty. While the record evinces that retractable fall arrest systems (which are hands-free) are equally safe and acceptable as rope grab systems (which require at least one hand to adjust), the record also suggests that a certain system may be preferable for different types of jobs. Brownstein Decl. Ex. 7, at 5 (doc. 140-1); Brownstein Decl. Ex. 8, at 6 (doc. 140-1); Brownstein Decl. Ex. 16, at 2 (doc. 140-2). In this case, Orta-Carrizales was tasked with carrying 30- to 40-pound bags of asbestos across approximately two-inch joints positioned at an incline, on a roof that was otherwise known to be dangerous and unstable. Brownstein Decl. Ex. 1, at 14 (doc. 140-1); Brownstein Decl. Ex. 3, at 5 (doc. 140-1); Brownstein Decl. Ex. 4, at 3 (doc. 140-1); Brownstein Decl. Ex. 12, at 3-4 (doc. 140-2). He testified that it was "impossible" for him to adjust his harness because it was very difficult to balance and "both hands [were] occupied with these 30- or 40- pound pieces of roof." Brownstein Decl. Ex. 12, at 3-5 (doc. 140-2); see also Brownstein Decl. Ex. 17, at 2 (doc. 140-2) (Gleason testifying that Orta-Carrizales could not adjust his harness because "[h]is duties to do his job that were assigned required both hands").

Orta-Carrizales also testified that his accident occurred "because of the circumstance of the project," including the fact that "there was a certain amount of time that the project had to be finished in . . . we were going against the clock" (which prevented him from periodically putting

down any load he was carrying and adjusting his rope grab). Ho Decl. Ex. B, at 14, 16 (doc. 138-2). Given conditions at the work site, Gleason opined that defendant should have furnished retractable harnesses, "which would have been much safer." Gleason Decl. Ex. 1, at 5-6, 11-12 (doc. 141-1). Indeed, the record suggests that defendant's own employees were using retractable harnesses. See, e.g., Brownstein Decl. Ex. 4, at 4 (doc. 140-1). In sum, a disputed question of fact exists concerning whether it would have been reasonable under the circumstances for defendant to require retractable harnesses for AAM's workers.

### ii. Statutory Duty

In addition to its common law duty to provide a safe workplace, a general contractor "owes a specific duty to all employees working on the premises to comply with the rules, regulations, and orders promulgated under WISHA." Vargas, 194 Wash.2d at 735-36 (internal citations, quotations, and brackets omitted). "A general contractor always owes this duty under WISHA – no analysis of whether the general contractor retained control is necessary." Id. at 736.

WISHA is codified in Chapter 49.17 of the Revised Code of Washington and has been implemented by Construction Safety Regulations contained in the Washington Administrative Code. Plaintiff asserts defendant's negligence in regard to the following six WISHA provisions: (1) WAC 296-155-100; (2) WAC 296-155-110; (3) WAC 296-155-24605; (4) WAC 296-155-24611 and WAC 296-155-24613; and (5) WAC 296-155-040. Pl.'s Mot. Summ. J. 20-21 (doc. 139).

### a. Management Responsibilities: WAC 296-155-100

This provision specifies that "[i]t is the responsibility of management to establish, supervise, and enforce, in a manner which is effective in practice [a] safe and healthful working environment[,] [a]n accident prevention program as required by these standards[, and] [t]raining

programs to improve the skill and competency of all employees in the field of occupational safety and health." WAC 296-155-100.

Thus, "[i]t is not enough for an employer to show the existence of a good paper program . . . the employer must prove the effective enforcement of its safety program in practice and not just in theory." Potelco, Inc. v. Wash. State Dep't of Labor & Indus., 194 Wash.App 428, 437, 377 P.3d 251 (2016) (citation and internal quotations, brackets, and ellipses omitted). This standard is met if the employee's failure to follow WISHA was an isolated occurrence and was not foreseeable. BD Roofing, Inc. v. Dep't of Labor & Indus., 139 Wash.App. 98, 113-14, 161 P.3d 387 (2007).

Defendant presented evidence that it required AAM to have a safety plan and training in place before work started, as well as daily safety meetings and associated logs. Brownstein Decl. Ex. 6, at 5 (doc. 140-1); Brownstein Decl. Ex. 12, at 5 (doc. 140-2); Brownstein Decl. Ex. 13 (doc. 140-2). However, Clarke testified that, other than the brief ten minute safety meetings, there was no evidence of any training done by AAM, even though defendant had an obligation to ensure that AAM was doing its fall protection training. Brownstein Decl. Ex. 16, at 3 (doc. 140-2). Further, during the Washington Department of Labor and Industries' investigation into the accident, two AAM employees (i.e., Sanavria and Leyva) reported that "no [harness] training was provided by AAM." Brownstein Decl. Ex. 14, at 9-10 (doc. 140-2).

Orta-Carrizales testified other AAM employees were having issues adjusting their rope grab harnesses given the nature of the work and that he had witnessed one of his co-workers fall through the roof. Brownstein Decl. Ex. 12, at 4-5 (doc. 140-2). He also stated that, while defendant was not allowed in the asbestos remediation area, "both crews were working at the same time in the building and on the roof" and "there weren't any [visual] barriers . . . so [defendant] was aware

of what was going on." Id. at 5. There is likewise evidence that defendant knew of at least two other people stepping through the Del Monte roof immediately before work began. See, e.g., Brownstein Decl. Ex. 3, at 4 (doc. 140-1); Brownstein Decl. Ex. 4, at 3 (doc. 140-1).

At a minimum, this evidence creates the inference that Orta-Carrizales' accident was not an isolated incident or unforeseeable, especially in light of Gleason's opinion that defendant neglected to manage all aspects of the job in accordance with its non-delegable statutory duties to ensure worker safety. Gleason Decl. ¶ 5 (doc. 141); Gleason Decl. Ex. 1, at 5-6, 11-12 (doc. 141-1). Accordingly, disputed issues of material fact exist concerning whether defendant breached WAC 296-155-100.

### b.     Accident Protection Plan: WAC 296-155-110

This provision sets forth "the minimal program [safety] elements for all employers," which must include:

> (a) How, where, and when to report injuries, including instruction as to the location of first-aid facilities. (b) How to report unsafe conditions and practices. (c) The use and care of required personal protective equipment. (d) The proper actions to take in event of emergencies including the routes of exiting from areas during emergencies. (e) Identification of the hazardous gases, chemicals, or materials involved along with the instructions on the safe use and emergency action following accidental exposure. (f) A description of the employer's total safety program. (g) An on-the-job review of the practices necessary to perform the initial job assignments in a safe manner.

WAC 296-155-110(3). Employers must also conduct and document "walk-around safety inspections" (at "the beginning of each job, and at least weekly thereafter"). WAC 296-155-110(9).

Defendant's subcontract with AAM required AAM to "comply with all safety and requirements prescribed by all Federal, State, County, and City authorities, and any other governmental authority having jurisdiction over the project." Brownstein Decl. Ex. 5, at 1 (doc. 140-1). AAM, in turn, had an accident prevention program (including a fall safety plan) that was

specific to the site and addressed the Del Monte project's hazards. Brownstein Decl. Ex. 14, at 11 (doc. 140-2). This plan identified the fall hazards by indicating the roof had "open-sided walking/working surfaces" and "floor openings." Id. The method of fall protection was identified as "personal fall arrest system" and "horizontal lifelines." Id. The plan mandated the AAM crew was to be "100% tied off while on roof," to attend "daily safety inspections before use of equipment," and to use their fall arrest and lifelines. Id.

AAM's crew also received training in how, where, and when to report injuries, including instruction as to the location of first-aid facilities; how to report unsafe conditions and practices; the use and care of required personal protective equipment; and AAM's safety program. Ho Decl. Ex. F (doc. 149-6); Ho Decl. Ex. H, at 6 (doc. 149-8).

Plaintiff does not dispute AAM held the required safety meetings. See, e.g., Clarke Decl. Ex. B, at 4-6 (doc. 150-2). During these daily meetings, AAM discussed fall safety, how to use the rope grab system, and checked the equipment to ensure it was working properly. Brownstein Decl. Ex. 13 (doc. 140-2); Ho Decl. Ex. D, at 5 (doc. 149-4); Ho Decl. Ex. H, at 6 (doc. 149-8); see also Brownstein Decl. Ex. 12, at 4 (doc. 140-2) (Orta-Carrizales acknowledging that, on the day of the accident, AAM held a morning safety meeting). Orta-Carrizales was specifically instructed at these meetings that his harness must be manually adjusted so that it would not exceed six feet. Brownstein Decl. Ex. 12, at 5 (doc. 140-2).

Before beginning work, defendant did a pre-job safety inspection of the site with AAM's supervisor, at which defendant "discussed the condition of the roof and the danger involved [and] a hundred percent tie off on that project." Brownstein Decl. Ex. 4, at 2, 4 (doc. 140-1). Defendant also had a system of ensuring and documenting unannounced site inspections. Ho Decl. Ex. C, at

2 (doc. 149-3). In fact, one took place on November 22, 2013, three days prior to the fall.[8] Brownstein Decl. Ex. 11 (doc. 140-2). In addition to random safety inspections, defendant's foreman was onsite daily. He performed a safety assessment every time he walked onsite; although he was not permitted in the asbestos remediation area, he would have worked with AAM to correct any safety violations he observed. Ho Decl. Ex. C, at 6, 9 (doc. 149-2). No material breach of WAC 296-155-110 occurred.

### c. Construction Requirements: WAC 296-155-24605

This provision requires employers to "ensure that all surfaces on which employees will be working or walking on are structurally sound and will support them safely prior to allowing employees to work or walk on them." WAC 296-155-24605.

AAM's foreman instructed the crew, including Orta-Carrizales, where it was safe to walk on the roof – i.e., the joists, which could be readily identified by looking "at where the nails were nailed in." Brownstein Decl. Ex. 12, at 3 (doc. 140-2). There is no evidence the joists were structurally unsound. See Brownstein Decl. Ex. 17, at 3 (doc. 140-2) (Gleason agreeing that "the frame of the roof was stable"). Defendant did not breach WAC 296-155-24605.

### d. Fall Protection Work Plan at 10 Feet or More: WAC 296-155-24611 and WAC 296-155-24613

These provisions state that, where the fall hazard is greater than 10 feet, the employer "must ensure that the appropriate fall protection system is provided, installed, and implemented." WAC 296-155-24611(1). In particular, such a system must "[b]e rigged to allow a maximum free fall distance of 6 feet so an employee will not contact any lower level." WAC 296-155-24613(1)(d).

---

[8] While AAM was not present during this inspection, defendant's safety specialist would not have been allowed in the area of any active asbestos work. As such, there is no indication in the record before the Court that AAM's absence on the day in question was material to Orta-Carrizales' accident.

The employer must also "develop and implement a written fall protection work plan" that, in relevant part, identifies "all fall hazards in the work area," and describes "the method of fall arrest or fall restraint to be provided" and "the proper procedures for the assembly, maintenance, inspection, and disassembly of the fall protection system to be used." WAC 296-155-24611(2)(a). Employees must be "trained and instructed in the" fall protection work plan "[p]rior to permitting employees into areas where fall hazards exist." WAC 296-155-24611(2)(b).

Here, there is no dispute that AAM provided its employees with a fall protection system in the form of a rope grab harness. Every witness in this case that proffered testimony concerning this subject remarked that a rope grab system conformed with industry standards. See, e.g., Clarke Decl. ¶ 6 (doc. 150). As specified above, AAM's fall protection plan identified the job hazards and method of fall arrest. Nevertheless, defendant concedes that AAM's fall protection plan did not include procedures for the assembly, maintenance, inspection, and disassembly of the rope grab system. Def.'s Resp. to Mot. Summ. J. 25 (doc. 148). Furthermore, neither defendant's foreman nor field supervisor recalled reviewing AAM's fall protection plan. Brownstein Decl. Ex. 8, at 8 (doc. 140-1); Brownstein Decl. Ex. 10, at 5 (doc. 140-1). Gleason testified that defendant's independent fall protection plan – which simply called for defendant to "monitor" AAM's work – was deficient. Brownstein Decl. Ex. 17, at 4 (doc. 140-2); Brownstein Decl., Ex. 21 (doc. 140-2). Defendant breached WAC 296-155-24611.

WISHA does not dictate that a written fall protection work plan include language concerning the proper length of the employee's lanyard – rather, it specifies that the fall arrest system itself must be tightened to a maximum distance of six feet. Orta-Carrizales testified that he was instructed and trained by AAM prior to starting work and daily thereafter on safety levels and the use of his harness. Orta-Carrizales further understood from this training, as well as his prior

roofing experience, that his rope grab system must be manually adjusted to retain no more than six feet of slack at any given time. Brownstein Decl. Ex. 12, at 2 (doc. 140-2); Ho Decl. Ex. E, at 11-21 (doc. 149-5); Ho Decl. Ex. G (doc. 149-7). Based on this evidence, the Court cannot conclude that defendant breached WAC 296-155-24613.

### e. General Safety: WAC 296-155-040

This provision states that the contractor "must furnish to each employee a place of employment free from recognized hazards that are causing or likely to cause serious injury or death" and "must not fail or neglect [to] provide and use safety devices and safeguards[,] adopt and use methods and processes reasonably adequate to render the employment and place of employment safe[, and] do everything reasonably necessary to protect the life and safety of employees." WAC 296-155-040.

Defendant maintains that a violation of this provision is contingent upon the more specific WISHA standards identified by plaintiff. See, e.g., Def.'s Resp. to Mot. Summ. J. 21-22 (doc. 148). Insofar as plaintiff does not separately address WAC 296-155-040, the Court agrees. Defendant breached WAC 296-155-040 to the extent it also breached WAC 296-155-100 and/or WAC 296-155-24611.

### B. Causation

To demonstrate proximate cause, the plaintiff must put forth evidence of both cause in fact and legal causation. Fabrique, 144 Wash.App. at 683. The former "refers to the 'but for' consequences of an act, or the physical connection between an act and the resulting injury." Id. The latter "rests on policy considerations as to how far the consequences of a defendant's acts should extend [and] involves a determination of whether liability should attach as a matter of law given the existence of cause in fact." Id. (citation and internal quotations omitted).

Concerning WAC 296-155-24611, the Court finds that causation is lacking. Absent a "more probable than not" basis, the causal relationship between the negligent act and the subsequent injuries is inadequate. It is undisputed that the underlying accident was not the result of a mechanical or maintenance issue with the rope grab system. As such, no reasonable jury could conclude that the inclusion of a description in AAM's fall safety plan on how to assemble, maintain, inspect, and disassemble the rope grab system would have prevented Orta-Carrizales' accident.[9]

Disputed issues of material fact nonetheless exist regarding whether defendant's breaches of its common law duty to provide a safe workplace and statutory duty to under WAC 296-155-100 were the proximate cause of Orta-Carrizales' injuries, and whether falling 40-feet through an unstable roof while carrying a heavy bag of asbestos and walking on narrow joists was a foreseeable consequence of that negligence. Contrary to defendant's assertion, the record suggests, on a more probable than not basis, that Orta-Carrizales' injuries would have been prevented if defendant had adequately engaged in its management responsibilities or required AAM to use retractable harnesses. These questions are appropriately resolved by the trier of fact.

Defendant is certainly correct that the record evinces Orta-Carrizales "fail[ed] to follow the site-specific safety rules [and] operate his rope grab properly despite having been a roofer for over six years at the time of the accident," and even perhaps that this negligence was paramount. Def.'s Resp. to Mot. Summ. J. 6, 22 (doc. 148). Nevertheless, it is undisputed that plaintiff need only show that defendant bore "some responsibility for Mr. Orta-Carrizales' fall" to proceed with

_____

[9] For the same reasons, plaintiff's myriad other specifications of negligence cannot survive summary judgment (with the exception of the two discussed immediately below). Critically, defendant's purported failure to mark joists, comply with WAC 296-155-110, WAC 296-155-24605, or WAC 296-155-24613, etc. were not the "but for" cause Orta-Carrizales' injuries given that it is undisputed he was trained in the proper use of his rope grab harness.

its claims. Def.'s Am. Mot. Summ. J. 11 (doc. 142). That is, "the act of another person, though a proximate cause of the accident, does not excuse the defendant's negligence unless the other party's negligence was the sole proximate cause of the plaintiff's injuries." See Brashear v. Puget Sound Power & Light, 100 Wash.2d 204, 207-08, 667 P.2d 78 (1983) ("[t]here may be more than one proximate cause of the same occurrence" such that "it is not a defense that some other cause or the act of some other person or company who is not a party to this lawsuit may also have been a proximate cause").

Thus, the fact that defendant has identified other potential causes for Orta-Carrizales' accident is insufficient to establish the propriety of summary judgment in its favor under Washington law. This is because, at this stage of the proceedings, the question is not which conclusion is most likely but whether an issue of fact exists that permits jury resolution

The Court cannot conclude, especially in light of Gleason's testimony, that Orta-Carrizales' and/or AAM's negligence was the sole cause of his injury. See Vargas, 194 Wash.2d at 735-38 (Gleason's expert opinion was sufficient to create a reasonable inference that the general contractor failed to provide a safe workplace, thereby precluding summary judgment). Conversely, the record does not establish that defendant's purported negligence was the lone source of Orta-Carrizales' accident.

## CONCLUSION

Plaintiff's Motion for Summary Judgement (doc. 139) is granted as to its declaratory judgment claim, as there is no material dispute that plaintiff has no duty to indemnify defendant for defendant's own negligence and is entitled to recover any settlement monies it paid in the Underlying Lawsuit related thereto, and denied in all other respects. Defendant's Amended Motion for Summary Judgment (doc. 142) is granted as to plaintiff's specifications of negligence under

WAC 296-155-110, WAC 296-155-24605, WAC 296-155-24611, and WAC 296-155-24613, and denied in all other respects. As such, only plaintiff's specifications of defendant's negligence under common law and WAC 296-155-100/WAC 296-155-040 remain before the Court. The parties' requests for oral argument are denied as unnecessary. The parties' Pretrial Order is due thirty (30) days from the date of this Opinion.

IT IS SO ORDERED.

DATED this 29th day of April, 2021.


_____/s/ Jolie A. Russo_____
Jolie A. Russo
United States Magistrate Judge